**RHODE ISLAND FEDERATION OF TEACHERS, AFL–CIO et al., Plaintiffs–Appellees,**

v.

**John H. NORBERG, Defendant–Appellant.**

**No. 79–1660.**

United States Court of Appeals, First Circuit.

Argued May 5, 1980.

Decided Sept. 17, 1980.

William G. Brody, Asst. Atty. Gen., Providence, R. I., with whom Dennis J. Roberts,

II, Atty. Gen., and John S. Foley, Sp. Asst. Atty. Gen., Providence, R. I., were on brief, for defendant–appellant.

Lynette Labinger, Providence, R. I., with whom Julius C. Michaelson and Abedon, Michaelson, Stanzler, Biener, Skolnik & Lipsey, Providence, R. I., were on brief, for plaintiffs–appellees.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

The principal question presented by this appeal is whether the district court properly concluded that a Rhode Island statute granting a state income tax deduction for tuition, textbook and transportation expenses incurred in sending dependents to primary and secondary schools in New England contravenes the Establishment Clause of the first amendment. Although judicial responses to the complexities of modern society have transformed the once "high and impregnable" wall erected between church and state by the first amendment, *Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), into a "blurred, indistinct and variable barrier," *Lemon v. Kurtzman,* 403 U.S. 602, 614, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745 (1971), we agree with the district court's conclusion that, if allowed to stand, the statute would form an unconstitutional bridge between church and state.

In May of 1979, Rhode Island Governor Garrahy signed an amendment to the Rhode Island income tax statute [1] allowing as a deduction from gross income amounts paid to others for tuition, transportation and textbooks in sending dependents to public and private schools in New England. R.I. Gen.Law § 44–30–12(c)(2).[2] The deduction was limited to five hundred dollars for each dependent enrolled in kindergarten or grades one through six and seven hundred dollars for each dependent enrolled in grades seven through twelve.[3] The term "textbooks" included only secular instructional material and equipment. *Id.*

In August of 1979, a coalition of individuals and labor and civic organizations brought suit pursuant to 42 U.S.C. § 1983 alleging violation of the first amendment,[4] as applied to the states by the fourteenth amendment, challenging the constitutionality of the statute and seeking injunctive relief against its enforcement by John H. Norberg, Tax Administrator of the State of Rhode Island. A temporary restraining order issued pending a hearing on the merits. After the hearing, the district court found the statute violative of the Establishment Clause of the first amendment and enjoined its enforcement. *Rhode Island Federation*

1. R.I.Gen.Law § 44–30–1 *et seq.*

2. R.I.Gen.Law § 44–30–12(c)(2) provides:
   (c) Modifications Reducing Federal Adjusted Gross Income.–There shall be subtracted from federal adjusted gross income . . .
   (2) amounts paid to others, not to exceed five hundred ($500) dollars for each dependent in kindergarten through sixth grade and seven hundred ($700) dollars for each dependent in grades seven through twelve inclusive, for tuition, textbooks, and transportation of each dependent attending an elementary or secondary school situated in Rhode Island, Massachusetts, Connecticut, Vermont, New Hampshire, or Maine, wherein a resident of this state may legally fulfill the state's compulsory attendance laws, which is not operated for profit, and which adheres to the provisions of the Civil Rights Act of 1964. As used in this section, "textbooks" shall mean and include books and other instructional materials and equipment used in elementary and secondary schools in teaching only those subjects legally and commonly taught in public elementary and secondary schools in this state and shall not include instructional books and materials used in the teaching of religious tenets, doctrines, or worship, the purpose of which is to inculcate such tenets, doctrines or worship.

3. For the 1978–79 school year, the average annual tuition nationwide in Catholic schools was $250 in primary schools and $700 in secondary schools. *Comeback in Catholic Schools,* U. S. News & World Rep., Mar. 20, 1978, at 54 *quoted in* Note, *Government Neutrality and Separation of Church and State: Tuition Tax Credits,* 92 Harv.L.Rev. 696, 701 n.30 (1979).

4. The first amendment provides in relevant part:
   Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]

*of Teachers v. Norberg*, 479 F.Supp. 1364 (D.R.I.1979).

The State contends, on appeal, that the district court erred in concluding that (1) the tuition deduction had the primary effect of advancing religion; (2) the textbook and instructional materials and equipment deduction would have necessitated surveillance of the choice and use of materials selected, resulting in excessive government entanglement with religion; and (3) the transportation deduction could not be severed from the unconstitutional portions of the statute. We discuss these issues *seriatim*.

*The Tuition Deduction*

The State challenges the district court's conclusion that the primary effect of the tuition deduction was to advance religion on two grounds. First, the State argues that the court erred in assuming that the receipt of a tax benefit by parents whose children attend sectarian schools would result in receipt of a benefit by religious schools themselves. Second, the State contends that the court erred in applying *Committee for Public Education v. Nyquist*, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973), to this case, asserting instead that the case is controlled by *Walz v. Tax Commission*, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970).

■ In regard to the first argument, we observe that the district court found "that the primary effect of the tuition tax deduction is the advancement of *religion*," *Rhode Island Federation of Teachers v. Norberg*, 479 F.Supp. at 1371 (emphasis added), not religious institutions, as implied by the State. There is no requirement in this case that the plaintiffs prove that religious schools are directly benefited by the tuition deduction. It is sufficient that the plaintiffs show that a primary effect of the tuition deduction is to confer a special benefit on the parents who choose to send their children to sectarian institutions. The law carries the rest of the plaintiffs' burden, assuming, as a matter of common sense and experience, that conferral of a benefit for the performance of a religious act will make people more likely to continue to perform the act or to begin to perform it if they are not already doing so. The Supreme Court has stated in declaring tuition reimbursement grants for attendance at sectarian schools unconstitutional:

> [I]f the grants are offered as an incentive to parents to send their children to sectarian schools by making unrestricted cash payments to them, the Establishment Clause is violated whether or not the actual dollars given eventually find their way into the sectarian institutions.

*Committee for Public Education v. Nyquist*, 413 U.S. at 786, 93 S.Ct. at 2972. The Court made clear that conferral of similar benefits by tax device is equally unconstitutional, regardless of whether the dollars not paid in taxes ever reach the religious institution:

> In practical terms there would appear to be little difference, for purposes of determining whether such aid has the effect of advancing religion, between the tax benefit allowed here and the tuition grant allowed under § 2. The qualifying parent under either program receives the same form of encouragement and reward for sending his children to nonpublic schools. The only difference is that one parent receives an actual cash payment while the other is allowed to reduce by an arbitrary amount the sum he would otherwise be obliged to pay over to the State.

*Id.* at 790–91, 93 S.Ct. at 1274. By encouraging parents to send their dependents to religious institutions, the tax benefits aid the institutions themselves:

> Special tax benefits, however, cannot be squared with the principle of neutrality established by the decisions of this Court. To the contrary, insofar as such benefits render assistance to parents who send their children to sectarian schools, their purpose and inevitable effect are to aid and advance those religious institutions.

*Id.* at 793, 93 S.Ct. at 2975–2976.

Since the statute is facially neutral and does not speak in terms of sectarian schools,

the more important question is whether the district court properly concluded that the tuition deduction had the primary effect of conferring a tax benefit on parents who send their children to sectarian schools. After reviewing the facts found by the district court, undisputed here by the State, and analyzing the facts which may properly be inferred as flowing from the Rhode Island income tax statute, we find the district court's conclusion to be sound.

The Rhode Island income tax system, like that of some other states, piggybacks on the federal income tax system. Rhode Island taxpayers may determine their state income tax liability in either of two ways. The first method simply sets the State tax at nineteen percent of the taxpayer's federal income tax. R.I.Gen.Law § 44–30–2(a). The second method requires reference to tax tables prepared by the State Tax Administrator. R.I.Gen.Law § 44–30–3. Use of the tax tables requires determination of the taxpayer's "Rhode Island income," R.I. Gen.Law § 44–30–12(a), a term describing the taxpayer's federal adjusted gross income further adjusted by additions and deductions provided by Rhode Island law, including those at issue here. The tax tables are designed to produce a tax of not more than five dollars less, if no Rhode Island deductions are taken, than would be produced by application of the nineteen percent Rhode Island tax rate to the taxpayer's federal income tax. The main purpose of the tax tables, however, is to allow the taking of Rhode Island deductions. Accordingly, we may infer that a person would

benefit from the tuition tax deduction if the person (1) owed a federal income tax, and (2) sent one or more dependents to a qualifying[5] primary or secondary school in New England, and (3) paid money to others for the tuition of any dependents attending qualifying schools. For practical purposes, the amount of tax benefit received by particular taxpayers would depend upon the amount of the deduction and their federal income tax bracket. In some cases, if the deduction were large enough, the taxpayer would move into a lower federal tax bracket for purposes of computing Rhode Island's tax.[6] The Rhode Island Budget Office estimated at the time of enactment of the statute that eligible taxpayers would receive an average tax benefit of thirty–three dollars from the deduction.

The facts found by the district court show the true color of the tuition deduction. The court found that, of the 29,387 students attending nonpublic and tuition funded public schools in Rhode Island in 1979, ninety–four percent (27,397) attended sectarian schools. Although the district court received no evidence concerning the number of religious affiliation of students attending schools outside Rhode Island whose parents would be eligible for the Rhode Island income tax deduction, there was uncontradicted evidence that seventy–nine percent of the students enrolled in nonpublic schools in New England attend sectarian schools. From these facts, it drew the reasonable inference that "the overwhelming majority of parents eligible for the challenged tuition deduction send their children to sectarian

---

5. Only expenses incurred in sending dependents to nonprofit institutions which satisfy Rhode Island's compulsory attendant laws, and which comply with the antidiscrimination provisions of the Civil Rights Act of 1964, qualify for the deduction. R.I.Gen.Law § 44–30–12(c)(2).

6. For example, the Joneses, a family of four persons, has a federal adjusted gross income of $12,000. Using their standard personal exemptions, their federal taxable income is $8,000 and their tax is $702 (1979 Tax Rate Schedule). Their Rhode Island income tax would be $133.38 (.19 × $702). If the Jones family sends both children to a qualifying secondary school and incurs $700 in expenses for each, the de-

duction of $1,400 would reduce their Rhode Island income to $6,600. Since the Rhode Island tax tables are calculated to produce a tax of not more than five dollars less than would be produced by application of the nineteen percent rate of tax to the taxpayer's federal income tax, the Jones' savings flow, in effect, from operation of the changes of brackets and rates in the federal tax system. Thus, not only is their taxable income reduced by $1,400, but their effective marginal federal tax rate is reduced from 18% to 16% (1979 Tax Rate Schedule). Their Rhode Island tax would be $89.30 (.19 × $470), a saving of approximately forty–four dollars.

schools." *Rhode Island Federation of Teachers v. Norberg*, 479 F.Supp. at 1366. To that inference we add our conclusion that, because of the method of operation of the Rhode Island income tax statute, the tuition tax deduction would produce a tax benefit for any parent who owes a federal income tax. Given our knowledge of the broad impact of the federal income tax and since the class of parents is so large as to be very similar to the general class of federal taxpayers, we think it proper to conclude that the Rhode Island tuition deduction would confer a tax benefit along nearly solid sectarian lines. *Cf. Minnesota Civil Liberties Union v. Roemer*, 452 F.Supp. 1316, 1321 (D.Minn.1978) (a nearly identical statute found to confer no tax benefit unless it moved the taxpayer into a lower tax bracket).

In discussing the State's first argument, we have also presaged our response to the State's contention that this case is controlled by *Walz*, rather than by *Nyquist*. We address the issue in full, however, because the State has vigorously attempted at each stage of this litigation to squeeze the tuition deduction beneath the protective umbrella of *Walz*.

In *Walz v. Tax Commission*, the Supreme Court upheld a New York City property tax exemption for places of religious worship as part of a broad category of exemptions for religious, charitable, and educational institutions. 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697. The Court reasoned that, since places of worship were exempted from property taxation only as part of a broader class of properties owned by not–for–profit institutions, the exemption created only a minimal and remote involvement between church and state. *Id.* at 674–76, 90 S.Ct. at 1414–15, 25 L.Ed.2d 697. The Court also noted that exemption from taxation created less governmental involvement with religion than would taxation, and that exemption perpetuated a long established relationship between church and state in the United States. *Id.* at 676–80, 90 S.Ct. at 1415–17, 25 L.Ed.2d 697. *Walz* has been used for the premise, which the State relies on here, that an exemption which results in a sectarian benefit is more likely to pass constitutional muster than the direct grant of an equivalent benefit. Relying in part on this incorrect premise[7] and in part on the equally flawed theory that conferral of benefits on the parents of sectarian students is constitutionally distinct from conferral of the same benefit on religious institutions, supporters of religious education have attempted in recent years to use a variety of tax devices to reduce the cost of religious education. In addition to the statute at issue here, these devices have included: income tax credits for the educational costs of students enrolled in nonpublic primary and secondary schools, *Minnesota Civil Liberties Union v. Minnesota*, 224 N.W.2d 344 (Minn. 1974), *cert. denied*, 421 U.S. 988, 95 S.Ct. 1990, 44 L.Ed.2d 477 (1975); income tax credits for expenses incurred by any parent, in excess of expenses incurred by parents generally, in sending dependents to a nonpublic primary or secondary school, *Kosydar v. Wolman*, 353 F.Supp. 744 (S.D.Ohio 1972), *aff'd sub nom. Grit v. Wolman*, 413 U.S. 901, 93 S.Ct. 3062, 37 L.Ed.2d 1021 (1973); an income tax deduction of $1,000 per dependent attending a nonpublic primary or secondary school. *Public Funds for Public Schools v. Byrne*, 444 F.Supp. 1228 (D.N.J. 1978), *aff'd*, 590 F.2d 514 (3d Cir. 1979); an income tax deduction of up to $700 per dependent for expenses incurred in attending a public or private primary or secondary school, *Minnesota Civil Liberties Union v. Roemer*, 452 F.Supp. 1316 (D.Minn.1978); and an income tax deduction for each dependent attending a nonpublic primary or secondary school, with eligibility for the deduction starting at an income of $5,000 and with the amount of the deduction decreasing as the taxpayer's income increased, *Committee for Public Education v. Nyquist*, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948. Except for the one in *Roemer*, all of these

---

**7.** *See Abington School District v. Schempp*, 374 U.S. 203, 230, 83 S.Ct. 1560, 1575, 10 L.Ed.2d 844 (1963) (Douglas, J., concurring); "What may not be done directly may not be done indirectly lest the Establishment Clause become a mockery."

devices have been found to contravene the Establishment Clause.

The pivotal factor in determining the constitutionality of tax devices affecting religious institutions or religious education has been the breadth of the affected class. In *Walz*, places of worship were only part of a broader class of nonprofit institutions. In all but one [8] of the cases holding tax credits or deductions for educational expenses unconstitutional, the courts have found that most of the qualifying schools were sectarian. *Committee for Public Education v. Nyquist, supra* (85% of eligible schools sectarian); *Public Funds for Public Schools v. Byrne, supra* (95% of eligible schools sectarian); *Kosydar v. Wolman, supra* (98% of eligible schools sectarian).

■ In the only case in which a tax deduction for educational expenses has been upheld, the exact nature of the benefited class never became known because the parties stipulated that "some" students whose parents were eligible for the tax benefit attended sectarian schools. *Minnesota Civil Liberties Union v. Roemer*, 452 F.Supp. at 1318–19 n.2. The benefited class in *Roemer* included, at least on the face of the statute, the parents of both public and private school students. *Id.* Without evidence that more than "some" of the affected students attended sectarian schools, the deduction remained safely beneath the "minimal and remote involvement" umbrella of *Walz*. Thus, despite the near identity of the statutes in this case and in *Roemer*, the district court's finding here that the overwhelming majority of the parents eligible for the tuition deduction send their children to sectarian schools denies the tuition deduction the protection of *Walz* and places it, as the district court found, within the proscription of *Nyquist*. Absent a class having primari-

ly secular characteristics, as found in *Walz* and presumed to exist in *Roemer*, it cannot be said that the advantages flowing from the statute to the parents of sectarian school students will be incidental to secular ends and effects, *Public Funds for Public Schools v. Byrne*, 590 F.2d 514, 518–19 (3d Cir. 1979), or that conferral of the benefit will not, as the district court cautioned, "greatly increase the risk of religious rancor." *Rhode Island Federation of Teachers v. Norberg*, 479 F.Supp. at 1367; *see also Abington School District v. Schempp*, 374 U.S. 203, 259, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (Brennan, J., concurring).

*The Textbook Deduction*

■ Finding the textbook and instructional materials deduction "constitutionally distinct" from the textbook loan programs upheld by the Supreme Court, *e. g., Wolman v. Walter*, 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977); *Meek v. Pittenger*, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975), the district court ruled the deduction unconstitutional because of its "potential for excessive entanglement between church and state." *Rhode Island Federation of Teachers v. Norberg*, 479 F.Supp. at 1372. The court reasoned that the State would be obligated to ascertain that deductions were not taken for sectarian books and instructional materials and that instructional equipment was not used for sectarian purposes. The minimum surveillance required to fulfill these obligations, the court concluded, would result in excessive entanglement between church and state. On appeal, the State contends that the deduction would be taken by the parents, not by the religious institution, and that any entanglement will be between the state and the

---

8. In *Minnesota Civil Liberties Union v. Minnesota*, 224 N.W.2d 344 (Minn.1974), *cert. denied*, 421 U.S. 988, 95 S.Ct. 1990, 44 L.Ed.2d 477 (1975), the court found no facts relating to the composition of the affected class. Instead, the court interpreted the primary effects test of *Committee for Public Education v. Nyquist*, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973), to be, in fact, an "any effects" test. *Minnesota Civil Liberties Union v. Minnesota*, 224 N.W.2d at 353. This application of strict neutrality theory resulted in a finding of unconstitutionality. *See generally* L. Tribe, American Constitutional Law § 14–4 at 821 (1978). A subsequent attempt by the same plaintiffs to rely on the same theory in challenging another portion of the same statute in federal court failed for lack of a showing of primary effect. *Minnesota Civil Liberties Union v. Roemer*, 452 F.Supp. 1316 (D.Minn.1978).

parent. The State also argues that, if the instructional materials start "as secular, nonideological and neutral, they will not change in use." *Meek v. Pittenger*, 374 F.Supp. 639, 660 (E.D.Pa.1974).

Our analysis compels rejection of both arguments. We start with the premise that the State could not permit deductions to be taken for sectarian books or instructional materials, *see Board of Education v. Allen*, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968), or for instructional equipment that is used for sectarian purposes, *see Wolman v. Walter, supra. Compare Levitt v. Committee for Public Education*, 413 U.S. 472, 93 S.Ct. 2814, 37 L.Ed.2d 736 (1973) (reimbursement to religious schools of the cost of state mandated programs held unconstitutional because of the absence of an audit procedure to guarantee secular use of funds), *with committee for Public Education v. Regan*, 444 U.S. 646, 100 S.Ct. 840, 63 L.Ed.2d 94 (1980) (successor statute, with audit procedure, upheld). We note that there is already on the books a Rhode Island statute requiring local school committees to loan science, mathematics, modern language and other approved secular textbooks to all Rhode Island schoolchildren.[9] This, without more, gives the deduction a sectarian hue. The State's premise, that if instructional materials are nonideological and neutral to start with they will not change in use, does not apply where the source of the materials is sectarian.

■ Any surveillance effort will, of course, begin with the parents who take the deductions. We think it highly unlikely, however, especially in the case of textbooks and instructional materials, that the choice of materials will be made by the parent. If only to ensure that students study proper materials and are evaluated fairly, schools will be forced to provide some guidance on the purchase of educational materials. Thus, if a dispute arises as to the religious nature of a text or instructional materials, the dispute will eventually have to be resolved between the State and the affected religious institution. If the State disallows the deduction, the question is appealable to state court, and the State will be asked to define an article of faith as a matter of law. This is precisely the kind of affirmative entanglement of church and state the first amendment prohibits. Moreover, there is also present, at least, the seeds of conflict between parents and the state as to matters of religious faith. If the State contends a written document or other material is religious in nature, a parent may deny its relation to his faith so as to remain eligible for the tax deduction. The potential for encouragement of the denial of faith, to facilitate its practice, is a perversion of the concepts of religious liberty the first amendment embodies and protects. *See Abington School District v. Schempp*, 374 U.S. at 259, 83 S.Ct. at 1591.

The difficulty with this provision is not that the secular nature of the textbooks and instructional material for which deductions might be taken could not be guaranteed; it is that the involvement of church and state necessary to guarantee that result would excessively entangle church and state. *See generally Surinach v. Pesquera de. Busquets*, 604 F.2d 73 (1st Cir. 1979). The district court correctly distinguished this case from those in which the state determines in advance of the purchase the secular nature of texts and instructional materials. We agree that continuing surveillance would be necessary to ensure that equipment which can be used for both secular and sectarian purposes, such as tape recorders and projectors, are used only for secular purposes.

*The Transportation Deduction*

■ We find no error in the district court's conclusion that, because the transportation deduction was a minor part of the challenged statute, it could not be severed from the unconstitutional portions of the statute.

■ The general savings or separability clause of the Rhode Island Income Tax Act, R.I.Gen.Law § 44–30–96, was enacted prior

---

9. R.I.Gen.Law § 16–23–2.

to the adoption of the deductions at issue here. While there is a presumption of separability where such a clause exists, *Sutherland on Statutory Construction* § 44.09 at 351 (4th ed.), the determining factor is whether the legislature would have enacted the transportation deduction independently of the tuition and textbook deductions. *See Champlin Refining Co. v. Corporation Commission,* 286 U.S. 210, 52 S.Ct. 559, 76 L.Ed. 1062 (1932). This necessitates divining the legislative intent of a legislative body that keeps no record of floor debate and chose not to include a separability clause in the challenged act. The legislature could have enacted the deductions in separate sections of the same act; it chose instead to include them in the same sentence. All three deductions have the same purpose as evidenced both by their design and their effect. Moreover, as the district court found, the fiscal note [10] to the act and the fact that the State already requires local school committees to provide free transportation to all primary and secondary students in Rhode Island [11] indicate that the transportation deduction was perceived by the legislature as a small part of the entire bill. In effect, the only persons likely to use this deduction would have been those whose dependents attended school outside Rhode Island. Considering all these factors, we think the district court was correct in inferring an intent to allow the transportation deduction to ride with the rest of the statute. *See Meek v. Pittenger,* 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217; *see also Sloan v. Lemon,* 413 U.S. 825, 833–34, 93 S.Ct. 2982, 2987, 37 L.Ed.2d 939 (1973).

*Affirmed.*

LEVIN H. CAMPBELL, Circuit Judge (concurring and dissenting).

I agree with the court that the tuition and textbook deductions are foreclosed by decisions of the Supreme Court. The tuition deduction seems to me to be utterly foreclosed by *Committee for Public Educa-*

*tion v. Nyquist,* 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973). The textbook deduction seems more acceptable at first blush, but because it encompasses materials other than strictly textbooks, and because of the other factors stated in the court's opinion, it is deficient under the reasoning in *Meek v. Pittenger,* 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1974), and, more recently, *Wolman v. Walter,* 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1976).

At this time when many Americans feel oppressed by the bigness and drab uniformity of many public institutions, judicial decisions of this nature, which seemingly detract from efforts to maintain a diverse educational system and a pluralistic community, may seem perplexing. Many people might prefer the path urged by Justice White in his dissenting opinion in *Nyquist* which, had it been followed, would have allowed room for legislation of the type presently before us. It is clear, however, that a majority of the Court favors a stricter degree of separation of church and state to avoid the evils of which history and experience inform us when the two become too closely intermingled. The lower federal courts are obligated to construe the law as the high Court provides, and thus I can see no basis for upholding the tuition and textbook deductions.

The transportation deduction presents a different situation. By itself it is constitutional. I see no reason to strike it down. I am not persuaded that those who supported this legislation would want it to disappear just because the other items cannot survive. Thus I dissent as to this relatively minor aspect of the court's opinion.

---

**10.** A fiscal note is the legislature's estimate of the cost of implementing the bill and is part of the legislation.

**11.** R.I.Gen.Law § 16–21–1 *et seq.*